U.S. Bankruptcy Court
District of Idaho
Filed: November 16, 2004
at 3:30 p.m.
By: JC

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| NEIL W. HIATT and | ) | Case No. 04-00647 |
| MYRTLE G. HIATT, | ) | |
| | ) | |
| Debtors. | ) | MEMORANDUM OF DECISION |
| | ) | |
| | ) | |

## I. BACKGROUND

Neil and Myrtle Hiatt ("Debtors") filed a voluntary petition for chapter 13

relief on March 1, 2004. Doc. No. 1. Their proposed Amended Chapter 13 Plan

of July 8, 2004, Doc. No. 43 (the "Plan"), came on for confirmation on August 24,

2004. *See* Doc. No. 49 (Minute Entry). Confirmation was taken under advisement

on September 17, 2004, at the conclusion of post-hearing briefing.

Creditor Bank of the West ("BOTW") objects to confirmation. Doc. No. 46.

The Chapter 13 Trustee, Bernie Rakozy ("Trustee"), also opposes confirmation. *See*

Doc. No. 47 (Trustee's Findings and Recommendations); Doc. No. 51 (Affidavit).

The evidentiary record consists of that developed at the August 24 hearing,

as well as that presented on May 5, 2004, in connection with BOTW's motion for

MEMORANDUM OF DECISION - 1



§ 362(d) relief that was settled prior to decision. *See, e.g.,* Doc. No. 31 (Minute Entry); *see also* Doc. No. 48 (Transcript); Ex. Q (same).

This Decision constitutes the Court's factual findings and legal conclusions on the contested matter. Fed. R. Bankr. P. 9014, 7052.

## II.  FACTS

The material facts are established by the evidence presented at the two identified hearings.  There are limited additional facts established through documents and pleadings in the Court's files and records.  All factual findings based on testimony incorporate the Court's determinations as to the credibility of witnesses and the weight to be accorded their testimony.

### A.  Prior Chapter 11 case

Debtors are in their 70's, and have farmed and ranched for several decades. They also acquired real property used to generate rental income.

Debtors filed a voluntary chapter 11 petition in March, 2003, commencing Case No. 03-00832.  That case was dismissed by the Court following a hearing on the motion of the United States Trustee ("UST") under § 1112(b).  Dismissal occurred on October 21, 2003.

The undersigned was the presiding judge in that case, and can observe that the dismissal was a result of Debtors' numerous failures to comply with the Code and Rules applicable to chapter 11, including the failure to file monthly financial reports, a lack of proof of insurance of estate assets, a lack of proof that accounts

MEMORANDUM OF DECISION - 2

were properly established and maintained, a failure to show that cash collateral was properly handled, a failure to file any disclosure statement, and the failure to file a plan.

### B. Post-dismissal events

Soon after the dismissal of the chapter 11 case, BOTW commenced a state court action, filing its complaint on November 13, 2003.  In that litigation, Debtors indicated a lack of defense to BOTW's summary judgment motion. *See* Ex. M.  On March 1, 2004, on the eve of the hearing on BOTW's summary judgment motion, Debtors filed the instant chapter 13 case.

Following dismissal of the chapter 11 but before the chapter 13 was filed, and while facing BOTW's state court litigation, Debtors made several notable asset transfers and other financial moves.

### 1. Sidney Hiatt loans and transfers

In October, 2003, apparently within 10 days or so of the dismissal of the chapter 11 case, Debtors entered into an agreement with Neil Hiatt's brother, Sidney.[1]  Sidney allegedly lent Debtors $30,000.00.  What Debtors did with the funds was never fully explained; Neil Hiatt simply testified that Debtors used the money to "[pay] back bills from what we were short in 2003, 2002" including "water, taxes, this type of thing." Ex. Q at 20-21.

---

[1] While the limited documents produced refer to both Sidney and his wife, Carol, the Court will adopt the practice of the parties and refer solely to Sidney.

MEMORANDUM OF DECISION - 3

The loan was allegedly secured by a deed of trust on certain Malheur
County, Oregon, real property owned by Debtors. *See* Ex. 5, Ex. 6. But there was
no proof that provision of this security occurred in October or at any other time.

On February 5, 2004, Debtors and Sidney agreed in a written document
(titled a "Collateral Assignment of Trust Deed") to increase the amount of the loan
by another $5,000.00, to release the prior real property security, and to "substitute
therefor . . . a certain promissory note . . . [performance of which was] secured by a
trust deed dated October 30, 2003[.]" *See* Ex. 5. Sidney thus received as security
for his loan all Debtors' rights under a secured promissory note they held from
Trenton Bodily and Julie Bodily. *Id.*

According to Exhibit 5, the Bodily note was dated October 30, 2003, and
had a principal amount of $60,000.00. Exhibit 5 alleges the Bodily note was
secured by real property in Malheur County (that property being described in an
attached exhibit) through the recording of a deed of trust on October 31, 2003.
Debtors contend that the note calls for $450.00 per month payments, and has a
balloon payment obligation at some point. Ex. Q at 19-21. The Bodily note and
deed of trust were not introduced into evidence, and the balloon payment date was
never identified.

The same $30,000.00 October, 2003 loan and $5,000.00 February, 2004
advance by Sidney were also collateralized by an essentially identical assignment

MEMORANDUM OF DECISION - 4

of a secured promissory note due Debtors from Leslie Young. *See* Ex. 6.[2] The
alleged principal amount of that note was $35,000.00. The Young note (allegedly
executed November 13, 2003) and deed of trust (allegedly recorded November 19,
2003) are also not before the Court. Debtors contend that $205.00 per month
flows from this note and that there is a balloon payment obligation, though they did
not specify when.

Both "collateral assignments" were filed in real property records on February
17, 2004, just two weeks before the instant bankruptcy filing. *See* Ex. 5; Ex. 6.

The initial schedules filed by Debtors showed a $35,000.00 secured claim
owed to Sidney, secured by "two assignment of contract receivable and two lots"
having a value of "$0.00" thus rendering the entire claim unsecured. *See* Ex. K at
schedule D; *see also* Doc. No. 1. A later amendment to schedule D alleged a
$45,000.00 value to the security, which would make Sidney's claim fully secured.
*See* Ex. K; *see also* Doc. No. 6.[3]

Certain, but very limited aspects of Debtors' underlying transactions with

---

[2] While the identity of the note obligors, the encumbered real property, and the
dates are different, the terms and conditions of the collateral assignment between Debtors
and Sidney regarding the Youngs' obligation, Exhibit 6, are identical to those in the
assignment regarding the Bodily obligation, Exhibit 5. The Court will at times refer
hereafter only to Exhibit 5, for purposes of simplicity, though its comments would apply to
both transfers.

[3] This amended schedule D was thus consistent with a contemporaneously
amended schedule B that asserted the Bodily contract had a $60,000.00 face amount and a
"current market value" of $30,000.00 and the Young contract had a $30,000.00 face
amount and a market value of $15,000.00. *Id.*

MEMORANDUM OF DECISION - 5

Bodily and Young were mentioned in the statement of financial affairs. *See* Ex. I, at question 10.[4]  However, nothing regarding the October-November, 2003 or February, 2004 transfers *to Sidney* of Debtors' interests in the Bodily and Young secured notes is mentioned in the statement of financial affairs Debtors' signed and filed. *Id.*

The assignments convey to Sidney "all the Assignor's right, title and interest in and to" the two promissory notes, and the Assignor's rights in the security therefore.  However, the assignments are not absolute; the Debtors' rights are only assigned as security for repayment of the $35,000.00 owed Sidney.

The terms of the required repayment to Sidney by Debtors were not discussed.  The October 2003, $30,000.00 promissory note leaves blank the interest rate, date(s) for payments of installments, maturity, *etc. See* Ex. 5.  Under Idaho law, an incomplete instrument may still be enforceable. *See* I.C. § 28-3-115. If a note is incomplete because of the absence of a due date, the note is payable upon demand.  I.C. § 28-3-108(1)(ii); *see also* I.C. § 28-3-115 (at Official Comment).  Moreover, in the absence of an interest rate, the note is not payable with interest.  I.C. § 28-3-112(1).

Sidney's ability to demand payment on the note at any time is significant

---

[4]  The answer refers to an October 2003 transaction with Bodily concerning a pasture and a transaction with Young, apparently in October, 2003, regarding a vacant lot on Elm Street in Vale, Oregon.  Recall that the dismissal of the chapter 11 case occurred October 21, 2003.

MEMORANDUM OF DECISION - 6

because Sidney is entitled to exercise rights under the collateral assignments *only* in the event Debtors "default" in their payment obligations to him.  *See* Ex. 5 at 2 ("In the event Assignor [Debtors] default in the payment of their obligations to Assignee [Sidney] or in the performance of its agreements and warranties set forth in this Assignment and related security documentation, Assignee shall become the absolute owner of all of the Assignor's right, title, and interest in and to the promissory note and trust deed and all proceeds therefore without any claim or right of Assignor therein.").

At present, Debtors have continued to collect and use the monthly installments on the Bodily and Young notes.[5]  This would appear to indicate no default exists in Debtors' payment obligations to Sidney, whatever they are.  Sidney could presumptively alter the present situation by demanding payment and declaring default if payment were not forthcoming.  I.C. § 28-3-108(1)(ii).[6]

The Plan does not propose any payment of or on Sidney's secured claim

---

[5]  Debtors' original schedule I did not show income from these contracts.  Ex. K. The amended schedule I filed on March 19 added $655.00 as income under the category "Interest and dividends" but without identifying the source.  *Id.*; *see also* Doc. No. 6.  Neil Hiatt's testimony was that this referred to the $450.00 and $205.00 monthly contract payments.  Ex. Q at 21.  The latest schedule I continued this manner of listing the contract income.  *See* Doc. No. 34.

[6]  The collateral assignments state that "Assignor shall be privileged to collect the proceeds and/or otherwise manage the promissory note and trust deed in accordance with the terms and conditions thereof."  *Id.* at 2.  So far, that appears to be the case.  But these rights, like all others of Debtors as assignors, inure to Sidney upon "default in the payment" of Debtors' obligations.  *Id.*

MEMORANDUM OF DECISION - 7

whatsoever.[7]  The Plan does propose that the "collateral" securing the claim (which

Debtors describe in their Plan as the "Bodily and Young trust deeds, per

assignment, less monthly payments to be retained by Debtors") will be

"surrendered".  *See* Doc. No. 43 at 6.  That provision of the Plan also notes that

"Trustee may seek avoidance of this lien" of Sidney's.  *Id.*  Sidney has not objected

to the Plan's proposed treatment of his secured claim.

### 2.  Purchase of annuities

Debtors bought two life insurance annuities (one for each Debtor) at a cost

of $30,000.00 each.  Ex. 4.  Each annuity contract pays $450.00 per month.  *See*

Ex. K at amended schedule B;[8] *see also id.* at schedule I.  The annuities are claimed

as exempt.  *Id.* at schedule C.  No objection to the exemption has been timely

raised.  Fed. R. Bankr. P. 4003(b).

Debtors used funds from the sale of a double-wide home and related real

property to purchase the two annuities.  Ex. Q at 43-44.  Neil Hiatt's testimony

indicated that this asset was sold to Brian Yarborough.  *Id.*  The statement of affairs

indicates a November 2003 sale of a lot and mobile home to Brian Yarborough for

$62,000.00.  Ex. L.

---

[7] While any payments on this putatively secured claim would properly be in the
Plan rather than in Debtors' budgets, the Court has nevertheless reviewed the budgets of
record and found no indication of any payments to Sidney there either.  Furthermore, the
amended statement of financial affairs, Doc. No. 39, shows no pre-filing payments to
Sidney.  Thus, it appears Sidney has not been repaid anything, and it is not proposed that
he be paid anything on this claim.

[8] Schedule B also shows the "market value" of each annuity at $30,000.00.  *Id.*

MEMORANDUM OF DECISION - 8

The policies are dated January 26, 2004, just a little over a month before filing the instant case. Ex. 4. The statement of affairs did not disclose the transfer. Debtors attempt to justify this omission on the basis that, since they are elderly, this sort of conversion of a nonexempt asset into an exempt annuity income stream was within the "ordinary course" of their financial affairs. Thus, they argue, it did not need to be disclosed. They also assert the conversion of a nonexempt asset to an exempt asset on the eve of bankruptcy is unobjectionable.

### 3. Craig Hiatt

Debtors' adult son, Craig, provides labor and assistance in Debtors' farming operations, and has done so for an extended period of time. Debtors' schedules show Craig as holding a "mechanic's lien" for "feed and labor on cattle". Ex. K at schedule D. The lien is allegedly worth $30,000.00. *Id.* Craig filed an agricultural services lien on December 3, 2003, with the Oregon Secretary of State in the amount of $30,836.00. Ex. 2.

The lien is based on a "statement" regarding hay and labor Craig provided. Neil Hiatt signed this statement in November 2003. *See* Ex. O. Over the 15 years that Craig provided assistance to Debtors, this was the first such statement or accounting. Ex. Q at 39-41. The lien was prepared by an Oregon attorney, Stephen Fonda. *Id.* at 14, 39-40; *see also* Ex. O. Fonda also represented Debtors in the BOTW state court suit, and he created the collateral assignments for Debtors' transaction with Sidney. Ex. Q at 20, 40.

AO 72A
(Rev. 8/82)

BOTW argues that Debtors' "granting" of the lien to Craig was not properly disclosed in the statement of financial affairs. Debtors counter that no lien was ever "granted" at all, and no transfer occurred requiring disclosure. Rather, they argue that Craig's lien arose solely under statute and was independently asserted by their son. Clearly, though, it was asserted by Craig with the help of Debtors' lawyer, Fonda, and upon Neil's agreement to sign the unprecedented statement.

BOTW also argues that the lien will not withstand scrutiny and challenge as a statutory lien, and that there is an absence of adequate proof and support for the lien. Debtors respond that this is simply a priority dispute between BOTW and Craig. While Debtors' Plan proposes to pay Craig as a secured creditor on his lien under § 1325(a)(5)(B), it also notes that a contest between Craig and BOTW is a possibility. Doc. No. 43 at 4.

## C. Budget

Debtors' Plan payments of $100.00 per month are predicated on the income from the Bodily and Young contract receivables, some real property (duplex) rental income, the income from the two annuities, and social security benefits.[9] The Plan

---

[9] Debtors' first budget, filed at the inception of the case, alleged monthly income of $1,695.00 and expenses of "$0.00" for net available income of $1,695.00. *See* Doc. No. 1. The amount to be contributed to the Plan was shown as "$0.00". *Id.* Schedule I referred to an attachment regarding farm income, but there was no such attachment. *Id.* The second budget consisted of amended schedules I and J filed on March 19. Doc. No. 6. These reflected recurring monthly income of $3,189.00 and expenses of $3,078.95, for net income of $110.95 and a monthly plan payment of $100.00. *Id.* The annual farm income, per an attachment, was $36,000.00, and farm expenses were $19,150.00, leaving annual farm income of $16,850.00. *Id.* Both these budgets were included in Exhibit K.

MEMORANDUM OF DECISION - 10

also contemplates contribution of all net disposable farm income, estimated at $16,850.00 per annum. *See* Doc. No. 43 at 2.

The third and latest version of the budget is found in amended schedules Debtors filed on May 13. *See* Doc. No. 34. Here the monthly income and expenses mirror the second budget. *See* n.9, *supra*. However, the attachment regarding farm income substantially changed. It now alleges an increase in such income from $36,000.00 to $47,853.50 for both 2004 and 2005. Annual expenses of $28,615.00 are projected in 2004 (for net farm income of $19,238.50); and annual expenses are estimated at $22,400.00 in 2005 (for net farm income of $25,453.50). *Id.*

Such net farm income, together with the $1,200 per year from the monthly $100.00 payments, yields projected total Plan payments of $20,438.50 in 2004 and $26,653.50 in 2005. *See* Doc. No. 43 at 2 (Plan "estimates" farm income at $16,850 but obligates Debtors to pay the Trustee "all of their net disposable cattle and farm income").

Neil Hiatt and Debtors' hired consultant, Gary Thomas, both testified that these latest projections were accurate and achievable.

The Plan does not provide any specifics as to when this annual net farm income will be contributed. The budget speaks generally of "spring" and "fall" sales of cattle. Trustee objects to this vagueness, and indicates he is unable to determine if the payment proposals are feasible or if the best interest test of

MEMORANDUM OF DECISION - 11

§ 1325(a)(4) is met.  Doc. No. 47.

The Plan also proposes that the Trustee make several "annual" payments to creditors, to wit:  BOTW ($1,819.79 and $5,956.23), Malheur County ($2,391.85), and Craig Hiatt ($6,733.18).  *See* Doc. No. 43 at 3-4.  These total $16,901.05 per year.  The dates of the payments are not specified.  Trustee also objects to this lack of certainty.  *See* Doc. No. 47.

## III.  DISCUSSION AND DISPOSITION

BOTW raises several objections to confirmation.  They include Debtors' alleged lack of good faith (§ 1325(a)(3)); lack of Plan feasibility (§ 1325(a)(6)); inadequate treatment of BOTW's allowed secured claim (§ 1325(a)(5)); and failure to pay BOTW's unsecured claim to the extent it would be paid in a hypothetical chapter 7 case (§ 1325(a)(4)).  Doc. No. 46.  The Trustee joins in BOTW's objections.  Doc. No. 51.  He also provides several additional concerns and objections.  Doc. No. 47.  The Court considers all objections, and independently evaluates the confirmation standards found in § 1325.

### A.  Good faith

To be confirmed, a debtor's plan must be "proposed in good faith and not by any means forbidden by law." § 1325(a)(3).  The Court evaluates good faith through the "totality of the circumstances."  *In re Hult*, 04.1 I.B.C.R. 18, 20 (Bankr. D. Idaho 2004) (citing *In re Villanueva*, 274 B.R. 836, 841 (9th Cir. BAP 2002)).  The process is assisted by the identification of several factors that may be relevant.

MEMORANDUM OF DECISION - 12

AO 72A
(Rev. 8/82)

*Villanueva*, 274 B.R. at 841 (citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386,

1390 (9th Cir. 1982)).  This Court, in *In re Johnson*, 262 B.R. 831, 01.2 I.B.C.R. 72

(Bankr. D. Idaho 2001), listed those factors:

1) The amount of the proposed payments and the amounts of the
   debtor's surplus;
2) The debtor's employment history, ability to earn, and
   likelihood of future increases in income;
3) The probable or expected duration of the plan;
4) The accuracy of the plan's statements of the debts, expenses
   and percentage of repayment of unsecured debt, and whether
   any inaccuracies are an attempt to mislead the court;
5) The extent of preferential treatment between classes of creditors;
6) The extent to which secured claims are modified;
7) The type of debt sought to be discharged, and whether any such debt
   is nondischargeable in Chapter 7;
8) The existence of special circumstances such as inordinate medical
   expenses;
9) The frequency with which the debtor has sought relief under the
   Bankruptcy Reform Act;
10) The motivation and sincerity of the debtor in seeking Chapter 13
    relief; and
11) The burden which the plan's administration would place upon the
    trustee.

262 B.R. at 839 (citations omitted).  As noted in *Johnson*, this is a nonexclusive or

"non-exhaustive" list of factors the Court may consider.  *Id.*

There are two primary issues related to good faith debated at length by the

parties: the conversion of real estate equity into annuities, and the transfer of the

Bodily and Young secured contracts to Sidney.

### 1.  Purchase of annuities

In regard to the first, the evidence establishes that Debtors converted

$60,000.00 of available unencumbered assets to annuity contracts within 45 days

MEMORANDUM OF DECISION - 13

of filing the second bankruptcy case.[10]  Debtors argue that the purposeful

conversion of nonexempt assets into exempt assets or income is not fraudulent *per

se.*  Whether or not this contention would prevail over an argument that the transfer

was meant to hinder or delay a creditor is beyond the scope of this Decision.  *Cf. In

re Couch-Russell*, 03.4 I.B.C.R. 230, 233 (Bankr. D. Idaho 2003) (discussing

§ 727(a)(2)(A) issues regarding loss of discharge based on transfers made with intent

to hinder, delay or defraud creditors).  The Court is not called upon, in the present

posture of this chapter 13 case, to resolve that question.

That does not mean that Debtors' transfer, made while in financial straits

and between the two closely-spaced bankruptcy filings, is irrelevant to the question

of § 1325(a)(3) good faith.  The transfer removed $60,000.00 from the reach of

creditors.  This protection of assets continues in the chapter 13 case, since the plan

need only ensure that creditors would receive as much under the plan as they

would in chapter 7.  *See* § 1325(a)(4).  The percentage of unsecured claims that

would be paid in either a chapter 7 or 13 case was therefore significantly reduced

by Debtors' conduct.  As noted, the percentage of repayment to creditors is a factor

expressly identified in *Johnson*.[11]

---

[10]  Even if the sale of the real property was in November, 2003, the annuities were
purchased with those sales proceeds in late January 2004.  *See* Ex. 4.

[11]  To support the idea of good faith, Debtors argue that the income stream from
these new annuities goes into their budget and, thus, into their Plan.  That is true.
However, the recurring monthly income stream, of which the $900.00 in monthly annuity
payments is a part, provides only $100.00 per month in aggregate net income and, thus,
(continued...)

MEMORANDUM OF DECISION - 14

## 2. The collateral assignments to Sidney

The second major debate is over the transfer of the rights under the Bodily and Young notes to Sidney. *If* this was an effective and unavoidable transfer, at least some of the value of these contracts (outside the monthly income stream Debtors have to date received) was removed from the reach of creditors.

There are considerable doubts as to the bona fides of these transfers. Debtors have attempted to give Sidney a first and superior secured position in significant assets of the estate – contracts having a face value of some $90,000.00 and an alleged but unproven market value of $45,000.00. It appears that the grant and/or perfection of a security interest may be subject to avoidance. The Plan itself recognizes that possibility.

Perhaps such avoidance would be pursued under § 544(a). There was no proof of perfection of a security interest in Debtors' contract rights by filing a UCC-1 financing statement.

If perfection was instead arguably accomplished through the recording of the collateral assignments in real property records, perhaps avoidance would be pursued under § 547(b) as a preferential transfer because the recordation of the

---

[11](...continued)

Plan payments. This provides minimal distribution to creditors. It is not a "wash" where creditors receive, though over time, the entire amount of the assets shielded through the conversion into exempt annuities. Obviously, creditors will only receive the benefit of a small portion of the annuity income stream, and even that will be limited to the projected 60 months of the plan, while the annuity contracts could run much longer. *See* Ex. 4. Debtors thus overstate the proposition that good faith is shown by including the annuity payments as part of their gross income.

MEMORANDUM OF DECISION - 15

"collateral assignments" occurred so close to the bankruptcy filing. *See Hopkins v. Nord (In re Kent)*, 04.3 I.B.C.R. 113, 114 (Bankr. D. Idaho 2004) (addressing a security interest in real property as a preference); *Hymas v. Am. Gen. Fin., Inc. (In re Chase)*, 00.2 I.B.C.R. 73, 76-78 (Bankr. D. Idaho 2000) (same).[12]

Perhaps avoidance would be pursued, as BOTW and the Trustee have suggested, under § 548, on the basis that the assignment amounted to a fraudulent transfer.

Debtors argue that their Plan preserves the Trustee's ability to avoid the collateralization of Sidney's claim. That is true, but misses the point. BOTW is correct that Debtors' conduct and the existence of the potentially avoidable insider transfer has relevance to the good faith analysis under § 1325(a)(3). *See Johnson*, 262 B.R. at 839 (recognizing that the extent of preferential treatment of creditors is a factor).[13]

---

[12] If the argument is that the transfer occurred, under § 547(e), when the collateral assignment was recorded, *see Kent*, 04.3 I.B.C.R. at 114, that date was February 17, some two weeks prior to the petition date. Not only was that well within the standard 90-day preference period, since the transfer was to a family member, the one-year "insider" preference period of § 547(b)(4)(B) would apply. Obviously, the Court cannot comment here extensively on either the merits of an avoidance action or Sidney's ability to establish any § 547(c) defenses.

[13] Debtors argue repeatedly that, if the Trustee is successful in avoiding the transfer to Sidney, he would recover the *balloon payment* under the Young and Bodily notes for the benefit of creditors. *See, e.g.*, Doc. No. 52 at 2. The argument founders on the facts. The assignment was not limited to the balloon payments. Debtors assigned "all [their] right, title and interest" in the Bodily and Young notes, trust deeds and proceeds. The assignment secured Debtors' faithful performance of their obligation to Sidney. As discussed further below, Debtors' imprecise view of Sidney's claim and rights infects not just this argument but also how the Plan deals (or fails or deal) with Sidney's claim under § 1325(a)(5).

MEMORANDUM OF DECISION - 16

AO 72A
(Rev. 8/82)

The purchase of the annuities and the attempted transfers to Sidney, commenced immediately upon dismissal of the prior chapter 11 case, are relevant to the question of Debtors' good faith conduct and their fair treatment of creditors.

### 3.   Other factors

#### a.   Accuracy of the schedules

Debtors' initial schedules and statement of financial affairs lacked appropriate detail as to these transfers, and later amendments did not fully disclose and explain them. And indicated in several places above, the schedules contained numerous other omissions, errors and incomplete or inaccurate statements.[14] The accuracy of schedules is an acknowledged factor relevant to good faith. *Johnson*, 262 B.R. at 839, 842.

#### b.   Burdens on the Trustee

The Plan is so indefinite in its terms that an unacceptable burden is placed on the Trustee in administering it. This is another *Johnson* factor. At present, there is no certainty as to when payments, other than the *de minimis* $100.00 per month, are to be made into the Plan. Nor is there any certainty as to when the Trustee must make the Plan's annual payments to certain creditors. Moreover, the Trustee is called upon to pursue avoidance litigation with Sidney. This imposes not just a burden on the Trustee, but a related administrative cost on all creditors.

---

[14] There are others, not discussed in this Decision, that were identified in BOTW's submissions. Some, but not all, of these were addressed by amendment.

MEMORANDUM OF DECISION - 17

### c.  Preferential treatment of creditors

The uncertainty over the validity of the Craig Hiatt lien claim, or its priority as against BOTW, also places burdens on the Trustee.  While the dispute between these creditors is litigated or otherwise resolved, who is the Trustee to pay? Additionally, the circumstances surrounding the creation and assertion of this lien raise credible issues regarding Debtors' attempts to preferentially treat insider creditors.

### d.  Existence of nondischargeable debt

BOTW argues that its unsecured debt would be nondischargeable in a chapter 7 because Debtors provided BOTW with a list of equipment that was materially false.  Neil Hiatt admitted during testimony that an equipment list he signed for BOTW included a John Deere 4020 tractor and a John Deere 4450 tractor, neither of which Debtors owned.  Ex. Q at 30-31.  The list represented the value of the two items as $35,000.00.  Ex. N.

This cause has not been litigated, and no judgment of nondischargeability exists.  The Court obviously will not reach a decision on this question in the context of the present confirmation dispute.  *Accord Johnson*, 262 B.R. at 841-42. It is enough to recognize that there is at least a credible argument that BOTW has a claim that may be nondischargeable.[15]

---

[15]  Debtors' rejoinder is that the two tractors were fully encumbered by debts owed the Farmers Home Administration.  *See* Doc. No. 52 at 6.  The contention is not very persuasive.  First, Debtors rely on Exhibit 1 to establish the secured FHA debt.  *Id.*  That
(continued...)

MEMORANDUM OF DECISION - 18

In weighing all of these factors and considering the totality of all the
circumstances, the Court concludes that Debtors have not carried their burden of
showing that the present Plan is proposed in good faith.

### B. Feasibility

The Court must find a debtor's plan to be feasible before confirmation may
be ordered. *See Hult*, 04.1 I.B.C.R. at 19 (discussing the requirement of
§ 1325(a)(6) that "the debtor will be able to make all payments under the plan and
to comply with the plan."). Feasibility involves a question of fact on which the
debtor bears the burden of proof. *Id.* (citing *In re Gavia*, 24 B.R. 573, 574 (9th Cir.
BAP 1982)). The standard requires that the plan have "a reasonable likelihood of
success." *Id.* at 20 (quoting *In re Fantasia*, 211 B.R. 420, 423 (1st Cir. BAP 1997)).
Thus, in *Hult*, the Court found the plan feasible because that debtor had shown
"more probably than not" that he would be able to make all payments and
otherwise comply with the plan. *Id.* That the trustee in *Hult* was "understandably

---

[15](...continued)
exhibit is an equipment valuation by an auctioneer, which merely contains a notation about
a secured FHA claim on the JD4450 and JD4020. It does not establish a secured claim.
Second, there was a place on the collateral list, Exhibit N, where Debtors could have (and,
BOTW would argue, should have) disclosed any liens on the equipment and the lien
holders. These were left blank. The implication (or "representation") of Exhibit N was that
the two tractors were owned by Debtors and provided $35,000.00 of secured value for
BOTW. Third, the material question under § 523(a)(2) would not be whether there was in
fact value in the items but, rather, was there a representation that there was value to the
equipment as collateral to BOTW; was this representation known to be false; was it made
with the intent that BOTW rely and grant Debtors a loan; and was that reliance reasonable.
Thus, Debtors' argument, that there was "no harm [and] no foul" because there was no
value in the two tractors, is specious.

MEMORANDUM OF DECISION - 19

dubious" was not outcome determinative. *Id.*

### 1. Farm income

Debtors' farm income projections are, in some regards, rather weak. They are conclusory in form. They are not corroborated by experience and history, nor are they buttressed by objective data. They are in many ways just assertions. As noted, the assertions changed markedly from Debtors' first two budgets to their third. Still, attempts to contradict or impeach the projections were not particularly effective.

As in *Hult,* though the Trustee (not to mention BOTW) remains "dubious" regarding Debtors' ability to achieve their projected farm income, the Court must conclude that, on the balance of all the evidence submitted to date, Debtors have met the requirement of showing a "reasonable likelihood of success" in connection with the aspect of the Plan which relies on farm income. This, however, does not fully resolve feasibility concerns. The Plan's performance requires both annual farm income and regular monthly payments, and the absence of other factors which might derail the Plan.

### 2. Bodily and Young contract payments

BOTW and the Trustee argue that the avoidance of Sidney's collateral assignments would have an impact on Plan feasibility. They believe avoidance of the transfers would impact Debtors' ability to use the recurring monthly payments from the underlying contracts to meet the $100.00 monthly Plan obligation.

MEMORANDUM OF DECISION - 20

Debtors argue at length that this is not so.  They contend that the potential avoidability of Sidney's secured position in the Bodily and Young contracts relates only to the question of who (Sidney or the Trustee) will receive the balloon payments.[16]  Debtors observe that they presently receive the monthly instalments under those two contracts notwithstanding the assignment.  Thus, Debtors argue, successful litigation by the Trustee only increases the amounts that could be distributed (*i.e.*, the balloon payments go to creditors generally, not Sidney).[17]

Neither approach is fully consistent with the facts.  Debtors would bifurcate Sidney's rights into (a) his claims to the regular Bodily and Young contract payments, which Debtors intend to keep, and (b) his rights to the balloon payments owed by Bodily and Young which are due at some future, unidentified time.  This view, and the language Debtors use in the Plan for treatment of Sidney's claim, are not consistent with the agreements, Exhibits 5 and 6.  Those agreements assigned *both* the ongoing and balloon payments, as well as Debtors' rights as secured creditors on the underlying property, to Sidney as collateral.  There is no basis in the agreements to treat the monthly payments different from the balloon payments. *All* the contract payments are subject to a claim by Sidney *if* Debtors default in paying Sidney.

---

[16]  *See, e.g.*, Doc. No. 52 at 2 ("[Sidney] only has the right to the balloon payments.")

[17]  Doc. No. 52 at 2 ("If the trustee avoids the transfer, he will avoid the transfer of the balloon payment under the notes.")

MEMORANDUM OF DECISION - 21

To make feasibility more suspect, the promissory note's lack of terms including a maturity or due date means, under Idaho law, that the note is payable on demand.  Therefore Sidney could demand payment and declare default at any time.  Such a possibility makes the entire income stream from the Bodily and Young notes uncertain, and directly impacts feasibility.  Until Sidney's interest is either avoided or validated (and, arguably, even after), there is uncertainty that directly affects Debtors' ability to perform.[18]

Sufficient and serious doubt exists regarding Debtors' ability to perform the Plan.  Debtors' burden to show feasibility is not met.

### C.  Other confirmation requirements

Under § 1325(a)(1), a chapter 13 plan must comply with applicable provision of chapter 13 and the balance of Title 11, U.S. Code.  Therefore, the Court must consider Debtors' proposed treatment of all claims and creditors, and issues in addition to those raised by the objectors.

#### 1.  Treatment of Sidney's secured claim

Debtors propose that "the collateral" securing Sidney's claim be

---

[18] The Plan and Debtors' monthly budget contemplate the current contract payments will continue to be received by Debtors, and this helps fund the $100.00 Plan payment.  This is the feasibility issue the parties have focused on.  The Plan is silent about Debtors' obligation to contribute the balloon payments to the Plan.  The Plan appears to assume, without evidentiary or documentary support, that the balloon payments go to Sidney.  If the balloon payments are scheduled to be received by Debtors during the first 36 months of the Plan, they would have to be contributed in order to meet § 1325(b)'s disposable income test.  The issue cannot be resolved without clarity as to the timing of the balloon payments under the Bodily and Young notes.

MEMORANDUM OF DECISION - 22

AO 72A
(Rev. 8/82)

"surrendered" and, thus, they treat his claim under § 1325(a)(5)(C). The collateral to be surrendered is the "Bodily and Young *trust deeds*, per assignment, less the monthly payments to be retained by Debtors." Doc. No. 43 at 6 (emphasis added).

This characterization of the collateral is inapt and inaccurate. Under the circumstances, it does not appear surrender is an option. Certainly it cannot be an option until the bona fides of Sidney's claim and the potential avoidability of the collateral assignments are established.

Further, Debtors' proposed Plan treatment appears to try to split the rights allegedly held by Sidney into the contract income stream (which Debtors will not surrender), and the trust deeds (which they will surrender), and the balloon payments (which they view as subject to the Trustee's avoidance action). And while Debtors propose to surrender the "trust deeds" to Sidney, apparently enabling him to enforce Bodily and Young's balloon payment obligations, it seems that Debtors also plan to keep those same secured rights so that they can enforce the monthly payment obligations. There is no authority proffered supporting the ability to characterize or treat this creditor's rights in the manner Debtors' Plan provides, and Debtors' approach was not adequately explained or justified.

Plan treatment of Sidney is confused and does not comport with the facts or the requirements of § 1325(a)(5). The confirmation standard of § 1325(a)(1) therefore is not met.

AO 72A
(Rev. 8/82)

## 2.  Treatment of BOTW's secured claim

BOTW argues that the Plan's treatment of its secured claim is inadequate.[19]
This issue must be analyzed under § 1325(a)(5)(B)(I) and (ii).[20]

### a.  Retention of lien

BOTW first argues that there is no acknowledgment by Debtors that BOTW's
lien will be retained until payment of the secured claim is completed.  BOTW is in
error.  The District's model plan language, used here by Debtors in their Plan,
provides for lien retention.  *See* Doc. No. 43 at 3, ¶ 4.2.1.

### b.  Payment of allowed secured value

Section 1325(a)(5)(B) requires that, in addition to lien retention, debtors
must provide for payment of the allowed secured claim including a present value
factor (or interest) to the extent the payment is made over time.

The Plan provides for payments to BOTW of (a) $6,164.00 at 7%, paid
annually, on the claim secured by livestock; (b) $20,175.00 at 7%, paid annually,
on the claim secured by equipment; (c) payment "outside the plan" of $65,017.63
secured by real property; and (d) surrender of $26,732.70 in cattle proceed checks.

---

[19]  BOTW's proof of claim asserts a claim of $124,207.70 secured by livestock,
equipment, crops, inventory and accounts receivable.  *See* Claim No. 13.  BOTW asserts
an unsecured claim of $83,768.46.  *Id.*  The claim has not been objected to and is entitled
to the evidentiary presumption provided under Fed. R. Bankr. P. 3001(f).

[20]  Section 1325(a)(5)(A) is irrelevant; BOTW has not agreed to accept the Plan.
And § 1325(a)(5)(C) is not applicable; Debtors do not propose to surrender BOTW's
remaining collateral but, rather, to pay the allowed secured value of that collateral over
time and with interest.

MEMORANDUM OF DECISION - 24

The Plan appears, therefore, to provide for payment of a total principal amount of $118,089.33 of BOTW secured claims. Facially, this amount is inconsistent with the amount of the secured claim ($124,207.70) asserted in BOTW's proof of claim.

### c. Priming BOTW's lien

BOTW argues that, because Craig Hiatt's lien is to be paid and would effectively "prime" BOTW, Debtors have failed to provide for payment of the full allowed secured value of BOTW's claim. Doc. No. 50 at 8.

The Plan's $6,164.00 payment to BOTW secured by livestock (62 cows, 4 calves, 1 bull according to the Plan) is characterized as one on a secured claim in a "second lien position." *See* Doc. No. 43 at 3. The treatment of Craig's $30,836.00 secured claim (characterized as a "statutory lien" in the same 62 cows, 4 calves and 1 bull) contains the note:

> Bank of the West (BOW) contests this lien. Should BOW prevail in whole or part, the payments herein [to Craig] shall be remitted to BOW as may be determined by the Court.

*Id.* at 4. Craig Hiatt's secured proof of claim, Claim No. 3, has as yet not drawn any objection from BOTW.

Debtors' approach to the asserted claim is not patently unreasonable. If Craig's lien claim is validated, BOTW's allowable secured claim in that same livestock is presumptively reduced. *See* § 506(a) (an allowed claim is a secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property").

MEMORANDUM OF DECISION - 25

However, additional clarity could certainly be provided as to the Trustee's duty to reserve the funds ($6,733.18 per year) dedicated to Craig's claim until priority or validity of the claim is established.  The Plan is objectionable until this ambiguity is remedied.

### 3.  Best interest of creditors

The Court concludes that, given all the issues outstanding, and the limitations of the evidentiary record, it cannot make a reasoned and accurate finding of fact in regard to the § 1325(a)(4) test requiring the Plan to pay creditors not less than the amounts that would be received in a chapter 7 liquidation.  None of the parties has provided a clear and supported analysis on this point.  This defect in the record further supports denial of confirmation.

## IV.  CONCLUSION

For all the reasons stated, the Court concludes that confirmation must be denied.  To the extent encompassed by the foregoing, the objections of Trustee and BOTW to confirmation are sustained.  A separate order will be entered.

Dated this 16th day of November, 2004.

TERRY L. MYERS
CHIEF U.S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 26

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served by the method indicated below, a true copy of the document to which this certificate is attached, to the following named person(s) at the following address(es), on the date shown below:

DATED: November 16, 2004

Case No. 04-00647 (Neil W. Hiatt)

Office of the U.S. Trustee
MK Central Plaza
720 Park Blvd., Suite 220
Boise, ID 83712
jeff.g.howe@usdoj.gov
gary.mcclendon@usdoj.gov

☐ U.S. Mail          ☐ Facsimile          ✓ Email

D. Blair Clark
RINGERT CLARK
P.O. Box 2773
Boise, ID 83701-2773
dbc@ringertclark.com

☐ U.S. Mail          ☐ Facsimile          ✓ Email

Joseph M. Meier
COSHO HUMPHREY
815 w. Washington
Boise, ID 83702-5590
jmeier@chgw.com
jshephert@chgw.com

☐ U.S. Mail          ☐ Facsimile          ✓ Email

Kelly McConnell
GIVENS PURSLEY
P.O. Box 2720
Boise, ID 83701-2720
kgm@givenspursley.com

☐ U.S. Mail          ☐ Facsimile          ✓ Email

Bernie R. Rakozy
P.O. Box 1738
Boise, ID 83701
brrakozy@mindspring.com

☐ U.S. Mail          ☐ Facsimile          ✓ Email

*Ann B. Canderan*
Judicial Assistant to Judge Myers

Note to Email service: A PDF version of the above decision/order was electronically transmitted to the parties indicated above. Email service is provided as a courtesy only upon request of a party. To review an electronic image of the original of this document, or to subscribe for email service of future decisions/orders from the Bankruptcy Judge, please access the Court's Internet web site, www.id.uscourts.gov.

MEMORANDUM OF DECISION - 27